IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRIC OF UTAH

| | |
|---|---|
| MARY BETH SPOSI, an individual; and MENLO SMITH, an individual,<br><br>          Petitioners,<br><br>v.<br><br>SANTA CLARA CITY, UTAH, a Utah City, VERIZON WIRELESS, and WINDY PEAK, LC.,<br><br>          Respondents. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No.  2:17-cv-1057-CW<br><br>Judge Clark Waddoups |

## **INTRODUCTION**

Santa Clara City, Utah (the "City" or "Santa Clara") issued a conditional use permit to Verizon Wireless to build a cell tower on property owned by Windy Peak, LC.  The cell tower site is in an agricultural zoning area that has been designated as open space on the City's General Plan.  Petitioners Mary Beth Sposi and Menlo Smith are property owners who contend the City acted illegally and in an arbitrary and capricious manner when it approved the special permit to the alleged detriment of their property.  They appeal the City's decision and contend the special permit should be voided.[1]  The court concludes the City's decision is not supported by the evidence.  It therefore reverses the City's decision and remands the case to the City with the instruction to void the CUP.

---

[1]  Neither party followed the requirements under local rule DUCivR 7-4.  The court concludes such failure did not impact the substance or outcome of the case.

## FACTUAL BACKGROUND

In an era of ever-increasing wireless network expansion, cities and towns are grappling with the need for telecommunication facilities on the one hand and preserving a community's aesthetic and visual resources, zoning, and property rights on the other. Santa Clara is a small town in Southern Utah, with a population of 8,417. *See* U.S. Census Bureau, at www.census.gov/quickfacts/. It has a General Plan that expresses "a commitment to protecting agricultural lands and that the agricultural lands give Santa Clara 'a dramatic, open, and green gateway.'" Admin. Rec., at 18 (ECF No. 35) (quoting Santa Clara General Plan, § 9.3.7).[2] St. George is a neighboring city, with a population of 89,587. *See* U.S. Census Bureau, at www.census.gov/quickfacts/.

In 2016, Verizon Wireless ("Verizon") applied for a conditional use permit ("CUP") to construct a 100-foot monopole cell tower on property owned by Windy Peak, in Santa Clara. The property is known as Frei Farm. The site is in an "agricultural residential" zoning area, designated as open space "under the Santa Clara General Plan," and is also "next to the Santa Clara River" and "on or very near a planned public trail site" set forth in the City's "master trail plan." Admin. Rec., at 14–15 (ECF No. 35). At the Frei Farm elevation, the land is "relatively flat" with "no natural screening of the tower." *Id.* at 14, 38–43 (showing photo simulations of the tower from different vantage points around Frei Farm).

Frei Farm is located on a peninsula-like area of Santa Clara (the "peninsula"), where it is bounded on three sides by St. George, Utah. The following depicts Santa Clara's southern boundary in yellow.

---

[2] When the court cites a page in the record, it refers to the ECF pagination at the top of the page and not to pagination at the bottom of the document.



**Figure 1**

Admin. Rec., at 188 (ECF No. 36) (modified by adding red and blue stars).  The red star marks

the approximate location of the cell tower site at issue.  At the time of application, the area of St.

George immediately to the right of the peninsula (dark brown) was in development for a 57-unit

subdivision.  Admin. Rec., at 187 (ECF No. 36) (showing preliminarily approved plat); *Id.* at 215

(discussing subdivision).  The other area of St. George surrounding the peninsula and extending

south contains the Sunbrook subdivision, which is known for having extraordinary views of the

mountains and premier homes.  The developers of the subdivisions and some of the residents of

Sunbrook opposed the cell tower location because they asserted it would impact view lots and

view corridors that were carefully planned.  *See* Admin. Rec., at 212, 215 (ECF No. 36) and

3

Admin. Rec., at 3 (ECF No. 60) (discussing efforts to develop the subdivisions);[3] *see also* Admin. Rec., at 6–11 (ECF No. 60) (identifying those in Sunbrook who opposed building the cell tower at Frei Farm).  The area also has the Sunbrook Golf Club owned by St. George.  To the northeast of Frei Farm is Arrowhead Elementary School.  It is marked with a blue star on the photograph.  The golf course and school were alternate sites considered for the tower.

As detailed further below, the City denied Verizon's first application because it concluded the tower was contrary to the City's aesthetic planning and detrimental to the property of the Sunbrook residents.  Verizon then submitted a second application the following year, with modified terms and evidence.  The City approved the second application, and Petitioners appealed that decision to this court.

After Santa Clara approved the CUP, and while this appeal was pending, Verizon built the cell tower.[4]  The tower has three reported cells.  Admin. Rec., at 49–50 (ECF No. 36)

---

[3]  Petitioners' letter to Santa Clara's attorney was sent on March 23, 2017.  Admin. Rec., at 1 (ECF No. 60).  The letter was incorporated again in a letter to the Santa Clara City Council on July 25, 2017.  Admin. Rec., at 112 (ECF No. 36).  Although the letter was sent before the Planning Commission meeting and referred to again before the City Council meeting, it was not included in the administrative record.  To the extent the City contends the letter was not considered as part of the approval process, the City erred in excluding relevant information.  To the extent the letter was considered, but not included in the administrative record, the City erred in failing to include such information.  On October 4, 2018, the court ordered the City to supplement the record so that the March 23, 2017 letter was included.  *See* Mem. Dec., at 2 (ECF No. 59) (decided on October 3, 2018).  It did so pursuant to Section 10-9a-801(8)(a)(ii) of the Utah Code.  Although the supplemental record (ECF Nos. 60 and 61) contains more documents than the letter, the letter is the only document from the supplemental record referenced or relied upon in this decision.

[4]  The court warned the defendants twice that if Verizon proceeded with the cell tower construction and altered the status quo, it did "so at their own risk and may be required to dismantle the tower if the court issues a ruling adverse to them." Order, at 2 (ECF No. 45); Mem. Dec., at 10 & n.7 (ECF No. 59) (denying preliminary injunction due to lack of irreparable harm, but warning Verizon of risk it faced if court issued ruling adverse to it).

(showing service areas for each cell).  One cell serves Santa Clara; the other two serve St. George.  *See* Admin. Rec., at 94 (ECF No. 36) (stating tower adds an additional cell for Santa Clara); *Id.* at 23 (stating Santa Clara will be served by "one of the new cells (there will be three cells with the new facility))."  This case, therefore, presents a unique scenario where (1) Verizon applied for a CUP in Santa Clara, even though St. George would be the predominant beneficiary of a cell tower,[5] (2) Santa Clara was left to determine the impact not only for itself, but for St. George residents as well, and (3) Santa Clara approved the CUP application for the cell tower to the purported detriment of some St. George residents who are the petitioners in this case.

## I.    DENIAL OF FIRST APPLICATION

Verizon submitted its first application on March 9, 2016, and "[t]he Santa Clara City Planning Commission granted the conditional use permit in a public meeting held on June 14, 2016."  Admin. Rec., at 11 (ECF No. 35).  Petitioners appealed the decision to the Santa Clara City Council (the "Council").  On August 3, 2016, the Council reversed the decision and denied the application.  *Id.* at 22.  Because the denial explains the nature of location relative to the City's planning and zoning provisions, the court summarizes the denial as follows:

---

[5]  This is the second time that Verizon has used property in Santa Clara to support the needs of St. George residents.  Verizon seeks to offload the Santa Clara tower.  At least two cells in the Santa Clara tower partially serve St. George.  *See* Admin. Rec., at 49 (ECF No. 36) (showing purple and dark green cells from the Santa Clara tower partially serving St. George).  Because Verizon used so much of that tower to serve St. George, it asserts the capacity of the purple cell is overloaded.  Thus, Verizon contends it must now build another tower in Santa Clara largely to serve St. George.

### A.      Detrimental Effects on Aesthetics and Property Values

The Council noted the open space designation, planned trail, and the geography at or near the site.  Admin. Rec., at 14–15 (ECF No. 35).  The Council also noted the proposed 100-foot "tower would obstruct extraordinary views of the northern mountains for the neighbors with 'view lots' to the south and southwest of the site," and that it would negatively impact "nearby property values."  *Id.* at 14–15.  It concluded "[a]ll of these attributes" made Frei Farm "*uniquely unsuited* for a 100-foot cellular tower."  *Id.* at 15 (emphasis added).  The City further concluded that the "proposed use [was] so incompatible with surrounding properties that the detrimental effects to the aesthetics and property in the area [could not] be substantially mitigated by imposing conditions to achieve compliance with the ordinance."  *Id.* at 15.

### B.      Prohibited Location – Open Space

The Council found that placing a tower at Frei Farm violated Santa Clara's zoning regulations because the "site has an open space designation under the Santa Clara General Plan."  Admin. Rec., at 15 (ECF No. 35).  The City's ordinances prohibit a cell tower in open space unless it "'blends with the surrounding existing natural and manmade environment in such a manner as to be effectively unnoticeable *and* a finding is made that no other location is technically feasible.'"  *Id.* (quoting Santa Clara City Code § 17.42.190(B)) (emphasis added).  Based on aerial views, the City concluded the tower would be "extremely noticeable" and not blend into the area.  *Id.* at 15–16 & n.22.  The City also concluded Verizon had failed to show "no other location [was] technically feasible."  *Id.* at 16.

### C.      Prohibited Location – Area Not Developed for Telecommunications

Even if the site was not in a designated open space, the Council found Verizon still failed to satisfy Santa Clara Ordinance 17.42.190(D).  That ordinance prohibits construction of a cell tower "in a location that is not already developed with telecommunications facilities," unless "one of two criteria is met."   Admin. Rec., at 16 (ECF No. 35).  Either (1) the tower must "be effectively unnoticeable" *or* (2) technical evidence is provided that shows a clear need for the facility and that collocating it on a site "already developed with telecommunications facilities" is not feasible.  *Id.* The City concluded Verizon had failed to provide evidence to satisfy any of these conditions.  *Id.* at 16–17.

### D.      Feasible Alternates with Less Environmental Impact

Santa Clara Ordinance 17.42.210(A) requires an analysis of "'all reasonable, technically feasible, alternative locations and/or facilities which would provide the proposed telecommunication service.'"  Admin. Rec., at 17 (ECF No. 35) (quoting Santa Clara City Code § 17.42.210(A)).  "[T]he study must 'explain the rationale for selection of the proposed site in view of the relative merits of any of the feasible alternatives.'"  *Id.* (quoting Santa Clara City Code § 17.42.210(A)).  The Council found that Verizon had failed to submit an "analysis or study regarding any alternative locations or facilities."  *Id.* Accordingly, it concluded the Planning Commission had 'failed to make the required finding" and no finding could be made from the evidence in the record.  *Id.* at 17–18.

### E.      Inconsistent with General Plan

The City has "a commitment to protecting agricultural lands," which gives the City "a dramatic, open, and green gateway."  Admin. Rec., at 18 (ECF No. 35).  The Council concluded

"[t]he 100-foot tower is so incompatible with the surrounding area that no conditions could be imposed to make it consistent with these standards." *Id.* at 19.

### F.      Federal Law – No Significant Gap

After concluding Verizon had failed to satisfy the City's ordinances on multiple grounds, the Council reviewed whether federal law required issuance of a permit.  The Council noted that if a wireless provider shows "a tower is necessary to cure a 'significant gap in coverage'" and that the site for the proposed facility is the least intrusive, then 47 U.S.C. § 332 may preempt a city ordinance.  *Id.* at 20 (citing *AT&T Mobility Svcs.v. Village of Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016)) (other citations omitted).  The Council found Verizon "wishes to *improve data speeds* and give *relief to overloaded* nearby towers, but it does not establish that Verizon users are experiencing dropped calls or that they cannot make calls reliably from the area in which the tower is to be located."  *Id.* at 21 (emphasis added).  The Council stated not only had Verizon failed to show a significant gap, it had failed to show "any gaps at all."  *Id.*  Moreover, the Council had found "no judicial opinion in which a court held that a need for improved data speeds constitutes a significant gap in coverage" and Verizon also cited no case.  *Id.*  Hence, the City concluded federal law did not preempt the City's ordinances. *Id.*  The City then reversed the Planning Commission's decision and denied the permit.  *Id.* at 22.

## II.      SECOND APPLICATION PROCESS

About five months later, Verizon submitted a second application on January 13, 2017.[6] This time, Verizon proposed to build "a 60-foot, monopole-style cell tower and supporting

---

[6]    As part of its application, Verizon stated it had met "the requirements of the National Environmental [Policy] Act" and received NEPA approval.  Admin. Rec., at 32 (ECF No. 35). Trileaf Corporation completed the NEPA investigation to determine if the site was within

ground equipment" at Frei Farm to make it more compatible with the area.  Admin. Rec., at 1 (ECF No. 35).  Verizon also offered to camouflage the facility so it could blend into the area, and it provided evidence to address some of the deficits the City had found in the first application.  *See e.g.*, *Id.* at 25, 52–59.  Moreover, the City hired CityScape Consultants, Inc. ("CityScape") as a telecommunications consultant to help inform the City about the appropriateness of Verizon's application.  *See* Admin. Rec., at 2 (ECF No. 36).  Thus, the second application and process for evaluating it differed from the first one.  Below, the court first addresses the facts about coverage and capacity issues.  It then addresses the facts on whether Frei Farm was the least intrusive alternative to satisfy federal preemption requirements under 47 U.S.C. § 332.

## A.    Coverage and Capacity

CityScape reviewed Verizon's application and documentation and discussed questions it had with Verizon.  CityScape then issued a report on May 1, 2017.  Of the four wireless network providers in Santa Clara, Verizon had "the best service" at the time of CityScape's report.  Admin. Rec., at 270 (ECF No. 35).  Nevertheless, CityScape concluded Verizon had provided sufficient documentation of coverage and capacity issues to justify Verizon's need for a new facility.  Admin. Rec., at 5 (ECF No. 36).

Verizon asserts it needed to construct a facility on Frei Farm "in order to reduce overloaded data capacity on its networks and remedy gaps in its coverage network in Santa Clara City."  Admin. Rec., at 135 (ECF No. 36).  Verizon's primary focus was on improving internet

---

viewsheds or "significant in American history, architecture, archeology, engineering or culture," or on or near "an Indian Religious Site."  Admin. Rec., at 186 (ECF No. 35).  The NEPA application required documentation of public notice.  *Id.* at 191.  Public notice was provided in the Santa Clara Weekly.  *Id.*  The Santa Clara Weekly is a publication in Santa Clara, California, not Santa Clara, Utah.  *Id.* at 192.  Thus, it appears the publication was deficient.

speeds versus voice services.  *See id.* at 93 (stating the main issue pertains to "coverage and capacity which is data"); *id.* at 121 (showing speed of data delivery impacting only the internet and not voice services).

Coverage pertains to "the geographic area the wireless signal will cover"  Admin. Rec., 3 at (ECF No. 36).  Typically, "the higher [an] antenna is mounted," the larger the geographical area that antenna will cover.  *Id.*  Capacity relates to the number of users who can simultaneously use the network and at what rate they are using bandwidth.  It is controlled by equipment at a tower's base station that has "capacity limitations as to the number of simultaneous transactions for each service Provider."  *Id.*  Verizon contends it "presented substantial evidence at the Planning Commission Hearing that the [Frei Farm] facility will cure a significant gap in coverage ***and*** capacity."  *Id.* at 135 (emphasis in original).

      i.    *Coverage - Propagation Maps*

According to Verizon, it provided "propagation maps and the testimony of Verizon Wireless' RF Engineer" to "demonstrate[] the . . . facility will cure a significant gap in ***coverage***."  Admin. Rec., at 135 (ECF No. 36) (emphasis in original).  The propagation maps also show some of "Verizon's existing sites" that were in operation at that time.  Admin. Rec., at 31 (ECF No. 35); Admin. Rec., at 45–47 (ECF No. 36).  Below are the propagation maps that show a comparison of coverage before construction of the facility at Frei Farm and what Verizon anticipated coverage would be after construction of the facility.



Existing 750 RSRP coverage around the site including Halfway and Sugarloaf



**Figure 2**



Proposed 750 RSRP coverage around the site including Halfway and Sugarloaf, and adding in Charbonne at the 60' level.



**Figure 3**

Admin. Rec., at 69, 72 (ECF No. 35).

The legend depicts the "wireless signal strength . . . measured in [negative] decibel-milliwatts ('dBm'), with higher negative numbers representing weaker signals." *Los Angeles SMSA Ltd. P'ship v. City of Los Angeles*, No. 2:16-cv-04954, 2021 WL 3741539, at *6 (C.D. Cal. Aug. 24, 2021). In this case, green signifies "good" or "great" coverage. Hr. Recording, at

5:00–6:32 (Nov. 7, 2019); Admin. Rec., at 46 (ECF No. 36).  Yellow signifies "okay" coverage.  *Id.*  Blue constitutes coverage that needs improvement.  Admin. Rec., at 46 (ECF No. 36).

The existing Santa Clara server is marked on the upper left-hand corner of the propagation maps.  That area is largely unchanged between the two maps.  Coverage fell within the green category before the proposed facility, and it remains in the green category with the new facility.  Thus, from a coverage aspect, the benefit to Santa Clara is not shown.

Viewing the two maps together,  the comparison illustrates that the main improvement to coverage involved changing yellow areas to green areas.  In other words, by placing a tower at Frei Farm, the primary modification was to change the second-best category of coverage to the best category of coverage.

As to the blue areas, it is undisputed that -100 dBm is in the range of unreliable coverage that needs improvement.  What is disputed is whether the blue areas on the propagation map constituted a significant gap in coverage.  Verizon acknowledges that it did not state the geographical size of the blue areas.  It did not state the number of users impacted in the blue areas.  Nor did it provide any evidence about the dropped call rate for the blue areas.[7]  Hr. Recording, at 8:15 to 9:26, 14:40 – 14:50, 15:25 – 15:35.  What is known is that the topography of the blue areas is largely bluffs with little to no residences or roads on them.  *Cf* Admin. Rec., at 11–12, 69, 72 (ECF No. 36) (showing blue areas before and after tower) *with id.* at 8–10, 53 (showing bluff and mountain areas in same location as blue areas with little to no roads or residences).  Thus, while there may be blue areas on the propagation map, Verizon failed to

---

[7]  Verizon likewise provided no information about the dropped call rate for the yellow areas.  It is unknown how many, if any users in the yellow areas, experience a coverage gap for voice services.

provide information about the population for such areas or the impact on coverage.[8]
Accordingly, Verizon failed to come forward with sufficient evidence to show a significant gap
in coverage.

　　　　　　ii.　　*Capacity Demands*

　　　　Although Verizon stated it has a coverage gap, meaning a gap in the geographic area a
wireless signal will cover, most of its statements appear to pertain more to capacity issues.
During the Planning Commission meeting on May 9, 2017, Jared White was present on behalf of
Verizon, along with a Radio Frequency Engineer ("RF Engineer") and Verizon's counsel.  Mr.
White stated "[t]he purpose for the site comes down to the demand of coverage.  There is simply
not enough cell towers to cover the vast amount of users."[9]  Admin. Rec., at 90 (ECF No. 36).
Directly thereafter, Mr. White stated that as usage increases, Verizon must,

> get closer to the source of that usage in order to provide that
> coverage.  *It's not that the cell towers can't transmit far enough;
> it's that they are saturated*.  The existing facilities cannot handle
> the volume.  There is not enough *capacity* in the network.  We
> have to *create more "entrances"* into the network and *this is the
> purpose of the additional facilities*.

*Id.* (emphasis added).  Consistent with those statements, CityScape reported Verizon's
"application is directly related to . . . over-capacity problems."  *Id.* at 3.  According to Verizon,
"[t]he only way to address this issue is to reduce the geographical area each site is required to
cover."  *Id.* at 48.

---

[8]　　The analysis applied to the blue areas applies the same to red and pink areas on the
propagation maps.

[9]　　Based on context, it appears that Verizon sometimes used the word "coverage" in a non-
technical sense when it meant "capacity."

    iii.  *Capacity – Data Graphs*

Verizon provided several data graphs from its RF Engineer to show over-capacity problems.  One graph showed a seventy-four percent increase in data delivered "by the *sole* existing cellular server in Santa Clara."  Admin. Rec., at 120 (ECF No. 36) (emphasis added).  On another graph, Verizon showed "the speed at which Verizon's *sole* existing server in Santa Clara was able to deliver data over the past year, averaged over all connections each day."  Admin. Rec., at 121 (ECF No. 36) (emphasis added).  The Verizon RF engineer also represented that "the *sole* Santa Clara server is rarely able to provide an average of 3 megabits per second ["mbps"]."  *Id.* at 122 (emphasis added).

Verizon's "sole server" reference was misleading and inaccurate.  It implied the Santa Clara server alone provided wireless broadband to Santa Clara, and that Verizon had no other facilities serving Santa Clara.  CityScape reported, however, that Santa Clara was not served by only one server.  Verizon had three facilities *in* Santa Clara.[10]  Moreover, just as the Frei Farm tower serves St. George, residents of Santa Clara were served by additional Verizon facilities outside of Santa Clara.  At the time of application, CityScape reported:

> Santa Clara receives personal wireless coverage from various existing facilities, starting in the northwest [1] with a *4-carrier* facility near Guy Lane on Old Highway 91, *Santa Clara*; [2] the various light stanchions accommodating *all Carriers* at the ball field on Rachel Drive, *Santa Clara*; [3] the 3 light stanchions accommodating *all Carriers* at the ball field on North Canyon View Drive, *Santa Clara*; [4] The towers at the water tank facility accommodating all Carriers in extreme North St. George at the end of Ledges Parkway; [5] the 2 towers accommodating all 4 Carriers called Red Oak in North Central St. George; [6] the rooftop facility at 345 North Bluff Street in St. George; [7] the small cell at 502

---

[10] A wireless provider can either build its own tower or lease space on a structure owned by another.

> South Airport Road, St. George; and [8] the facility known as
> Halfway on South Dixie Drive, St. George.

Admin. Rec., at 5 (ECF No. 36) (emphasis added).  The following depicts where the facilities are

relative to the tower at Frei Farm.[11]



**Figure 4**

*Id.* at 8.

Verizon's RF engineer also represented "[t]here are *many* applications and services that

require speeds above what can be delivered in Santa Clara today, *so they do not work*."  Admin.

Rec., at 122 (ECF No. 36) (emphasis added).  The graphs reported no impairment for "[p]hone

calls, texts, basic email," and "music."  Admin. Rec.,  at 121–22 (ECF No. 36).  They did report

---

[11]   The five servers shown in red are the same five facilities depicted on the propagation maps
(Figures 2 and 3 above) as serving in and around the relevant area.  *Id.* at 69.

impairment of video quality, web browsing, and file downloads. *Id.* There was no supporting information about in-building use, in-vehicle use, or measurements of reliability during any drive tests either for internet or voice services. Nor was there supporting evidence about which applications did not work or how widespread the problem was.

On a third graph, Verizon addressed population and use based on Verizon's entire network in Santa Clara. Admin. Rec., at 124 (ECF No. 36). Specifically, Verizon reported the total population of Santa Clara compared to the number of "Unique Devices on Verizon's Network in Santa Clara." *Id.* It reported a total population of about 7,000 and over 12,000 unique devices. *Id.* The graph, however, did not report the number of customers or people actually impacted. One resident may own multiple devices (smart phone, smart watch, laptop, and tablet for example). Identifying unique devices compared to a City's population does little to show the number of people actually served. Moreover, deriving such data from Verizon's entire network in Santa Clara, rather than from the Santa Clara tower at issue, fails to support a significant gap as to that tower or in that area.

Finally, Verizon stated its facilities in the area were "saturated *or* saturating" due to "the ever-increasing demand for data." Admin. Rec., at 43 (ECF No. 36) (emphasis added); *see also id.* at 210 (during City Council meeting, Verizon asserting "[t]he demand is *saturating all* of Verizon's facilities"). Logically, a facility is saturating as more users rely on its services. Being in the process of becoming saturated, however, is not the standard. Approval of a cell tower in an area not otherwise authorized for such use requires more than anticipated future capacity issues. Although the graphs have some dubious information and representations, the court nevertheless considers them together with the load capacity maps discussed below.

16

 iii. *Load Maps - Capacity*

 Verizon provided "capacity load maps regarding capacity" to show how "offloading from existing sites" will "provide better service to the citizens of Santa Clara."  Admin. Rec., at 136 (ECF No. 36).



**Figure 5 – Santa Clara Cell Coverage**  **Figure 6 – Frei Farm Coverage**

Admin. Rec., at 49–50 (ECF No. 36).

 According to Verizon, the existing Santa Clara server has one cell that is overloaded because it serves a 4.9-mile area.  *Id.* at 49.  That 4.9-mile area extends past Santa Clara into St. George in a southeasterly direction.  *See id.*  Figure 5 above is the capacity map depicting the 4.9-mile area in purple,[12] with the Santa Clara tower in the upper left-hand corner of the map.

---

[12] CityScape and Verizon referred to the area as "dark blue."  Admin. Rec., at 5, 13, 49 (ECF No. 36).  Consequently, the area may appear purple on some graphics and dark blue on others.

The court notes that covering a 4.9-mile area does not establish a capacity problem. The density of usage in the 4.9-mile area is the issue. Stated differently, even if a cell covers a large area, unless that area has dense usage relative to the capacity of the base station, such area will not impact capacity. Similar to the propagation maps, Verizon provided no data about the number of customers impacted in this area by capacity issues. Nevertheless, the size of the area covered by that cell supports it covers a large area relative to some other cells around it.

Figure 6 above is a capacity map that projected coverage if the Frei Farm facility were added. *Id.* at 50. By adding the new facility, Verizon asserted the existing Santa Clara cell would split coverage with one new cell from the Frei Farm tower and "cover about 1/5 of the existing cell's area," *id.* at 23; *see also* Admin. Rec., at 262 (ECF No. 35), thereby reducing capacity overload.

CityScape relied upon the load capacity maps when concluding Verizon had provided sufficient evidence to support the need for a new facility.[13] Admin. Rec., at 5 (ECF No. 36) (stating "capacity overload and signal gap" was shown by the capacity load maps). Although it is questionable that a large geographical area can show a significant gap in data capacity without

---

[13] CityScape cited to the load capacity map before Frei Farm was built and the anticipated load capacity map after construction. It stated it concurred that a 100-foot tower would have met Verizon's objectives better because "it is reasonable to believe that the remaining capacity overload shown in [purple], would have been eliminated." Admin. Rec., at 5 (ECF No. 36). It is unclear what CityScape meant by its comment. The purple region shows the geographical area served by a cell from the Santa Clara tower. That cell will always serve a geographical area (represented in purple) as long as it is operational. According to Verizon, once Frei Farm became operational, the purple area serves an ideal geographical area of 0.9. Admin. Rec., at 50 (ECF No. 36). Thus, nothing on the load capacity map for Frei Farm shows an overload for that Santa Clara cell, much less the need for a 100-foot tower due to any remaining overload on that cell.

other reliable information, the court accepts for purposes of this decision, that Verizon's graphs and load capacity maps, when viewed together, support such a conclusion.

Although Verizon focused primarily on internet services, CityScape did address voice service as well. CityScape stated, "in Santa Clara where there are limited base stations and the wireless airtime minutes are high, caller volume will exceed the designed network capacity, resulting in busy signals, dropped calls or a 'no service' message." Admin. Rec., at 3 (ECF No. 36). As stated above, Santa Clara is a small city. In light of Verizon's own engineering graphs showing no impairment for "[p]hone calls, texts, basic email," and "music," it is unclear what information CityScape used to draws its conclusions. Certainly, there is no information in the record about the number of busy signals, dropped calls, or other similar events actually experienced. Thus, the court concludes CityScape's conclusion about voice services is unsupported by the evidence.

## B.    Least Intrusive of the Other Locations

After CityScape evaluated the coverage and capacity issues, it next addressed whether Verizon had shown that Frei Farm was the least-intrusive location for the cell tower.[14] CityScape found that Verizon's evidence was insufficient for CityScape to form an opinion about the alternate sites. *Id.* at 4. Nor did Verizon's evidence show the tower would benefit Santa Clara. *Id.* Consequently, the parties and CityScape had a conference call on April 13,

---

[14] "Cellular search areas are usually circles," where "[t]he distance from the nearest existing site is determined" and used in the calculation. Admin. Rec., at 4 (ECF No. 36). For reasons that are not explained, Verizon's search ring was rectangular and largely encompassed the Sunbrook development and golf club area. Admin. Rec., at 10 (ECF No. 36). Verizon subsequently expanded its search ring further north. *See id.* (showing original search ring in yellow and expanded search ring in blue).

2017 to address the concerns. *Id.* On April 18, 2017, Verizon provided a PowerPoint presentation that had information about ten alternate sites Verizon had considered. *Id.* CityScape noted the presentation was informative, but some responses merely repeated "previous testimony with nothing new." *Id.* CityScape thought there would be more follow-up than what occurred. *Id.* Accordingly, on April 28, 2017, CityScape engaged in an additional discussion with Verizon, and concluded the added narration was sufficient to show a benefit to Santa Clara. *Id.* at 4–5. Following that discussion, CityScape issued its May 1, 2017 report.

Although CityScape had conferred with Verizon on several occasions, and Verizon had provided a PowerPoint addressing each of the alternate sites, CityScape still stated in the conclusion of its report that "there is substantial unknown information, mostly concerning the design parameters of each alternate location."[15] *Id.* at 7. CityScape encouraged the City to ask questions at the scheduled meeting before the Planning Commission if Verizon did not provide the information prior to it. *Id.* It also urged the City to "determine which is best for Santa Clara [because] there are options." *Id.* CityScape warned that if a tower went in at Frei Farm, it opened the likelihood of other providers collocating there based on federal law and local ordinances. *Id.* at 6.

      i.    *Frei Farm*

At the Planning Commission and City Council meetings, Verizon gave the PowerPoint presentation discussed above, which included the following information about design

---

[15] Verizon mistakenly implies that CityScape found sufficient information had been presented on all topics. Mem. in Opp'n, at 16–17 (ECF No. 72). To summarize the above, CityScape concluded there was sufficient evidence to support a need for the facility based on capacity issues. It also found sufficient evidence to show a benefit to Santa Clara. As to the alternate sites, CityScape concluded there was substantial unknown information, so its report was not as conclusive on that topic. Admin. Rec., at 7 (ECF No. 36).

parameters.  "Most wireless facilities have 3 cells."   Admin. Rec., at 49 (ECF No. 36).

According to Verizon, "[t]he ideal service area for one macro cell is just under 1.0 square mile."

*Id.* (emphasis omitted).  As for Frei Farm, Verizon stated its "location provides the most *ideal*

balance of service areas between the existing and proposed cells."  *Id.* at 50 (emphasis added).  It

noted that "[o]nly 1 new cell serves over 1.0 square mile."  *Id.* The following shows the balance

Verizon anticipated among the Frei Farm cells after offload of the Santa Clara cell:

| Cell | Service Area in Square Miles |
|------|------------------------------|
| Santa Clara Tower Cell | 0.9 |
| Frei Farm – Cell 1 | 0.7 |
| Frei Farm – Cell 2 | 2.4 |
| Frei Farm – Cell 3 | 0.9 |

*See id.* (stating the cell coverage areas).

Although Figure 6 supports that Frei Farm tower offloaded the Santa Clara Tower cell, it

appears to create another issue.  For simplicity of reference, the court repeats Figures 5 and 6:

 

**Figure 5 – Santa Clara Cell Coverage**          **Figure 6 – Frei Farm Coverage**

A comparison of Figure 5 and Figure 6 shows an inconsistency in the purple and dark green coverage areas for the Santa Clara tower.  As stated previously, the Santa Clara tower is in the upper left-hand corner of the map.  Besides the cell at issue, Figures 5 and 6 also show the geographical area covered by a second cell in the Santa Clara tower, which is depicted in dark green.  The Red Hills tower is on the upper-right hand part of the maps with the respective cell coverage areas shown in pink, gray, and olive green.  Santa Clara Drive is just below the Santa Clara tower and runs from west to east.

On Figure 5, the purple area north of Santa Clara Drive runs from the Santa Clara tower to where the Red Hills tower extends its coverage (pink area).  On Figure 6, however, the purple area north of Santa Clara Drive stops halfway, not because of Frei Farm offloading that area, but because Verizon adjusted the geographical area of the second cell (dark green) on the Santa Clara tower to cover that area.  Thus, it is not the Frei Farm tower alone that allowed the purple area to reach the ideal 0.9 square miles.  Verizon had to modify another cell on the Santa Clara tower to take more of the load.[16]  Only with that modification could Verizon reach the ideal offload.

As discussed above, when Verizon analyzed the internet speed for the Santa Clara tower, it did so based on all three cells.  By decreasing the load capacity of one of the Santa Clara cells, but increasing the load of another, the impact of that change needed to be taken into account to determine the overall functionality of that tower and the corresponding impact on Santa Clara.  That was not done.  Thus, it is unknown what benefit, if any, Santa Clara actually derived from

---

[16]  Per the discussion above about coverage and capacity, the larger the geographical area is that a cell covers, the greater the load on that cell.

the Frei Farm tower.  Moreover, when comparing Frei Farm to alternate sites, that was relevant information that should have been considered when determining the least intrusive location.

Besides stating that Frei Farm provided the most ideal balance, Verizon also asserted that "[i]nterference with the neighboring cells" at Frei Farm  "is easier to control than at *most* other locations."  Admin. Rec., at 50 (emphasis added).  Verizon made no notation on its PowerPoint about which other locations also would allow for control of interference from neighboring cells, nor was there any discussion in the record on this point.

Verizon's site plan also failed to state relevant information.  It contained no information about the distance between the proposed tower and the property line.  *See* Admin. Rec., at 64–65 (ECF No. 35).  During the public hearing before the Planning Commission, one of the adjoining property owners noted that omission.  Admin. Rec., at 89 (ECF No. 36).  Based on scale, however, the property owner stated the proposed tower on Frei Farm was approximately 13 feet from the property line.  *Id.* The adjoining property owner objected to that distance because of the burden it placed on his property.  *Id.* When Verizon was asked to address the issue, it merely stated, "[t]here is always a level of impact but we try to be the least intrusive to provide the best coverage."  *Id.* at 91.

As to aesthetic and detrimental impact on property values, Verizon asserted, "[t]he tower will not be visible from *the vast majority* of Lost Creek Drive and Emeraud."  *Id.* at 80 (emphasis added).  Lost Creek Drive and Emeraud are directly across the river from Frei Farm.  *See id.* at 112.  In contrast, other streets in Sunbrook rise up in elevation and have view corridors that rise in elevation.  *Id.* at 91, 112.  Verizon did not address the impact on them.

For those homes on Lost Creek Drive and Emeraud that would have the tower in view, the most Verizon offered about financial impact is the following:

> National studies demonstrate that most home buyers value good cell service over many other factors including school district when buying homes.  More than 75% of prospective home buyers said a good cellular connection was important to them.  Money, "The Surprising Thing Home Buyers Care About More than Schools", June 2, 2015.  The same study showed that 83% of millennials (those born from 1982 – 2004)[17] said cell service was the most important factor in purchasing a home.  *Id.*

Admin. Rec., at 19 (ECF No. 36).  The issue about the impact on property was relevant not only as to Sunbrook, but also for a planned subdivision directly east of Frei Farm.  During the City Council meeting, the developer informed the City that the preliminary plat for fifty-seven homes had already been approved by St. George.  *Id.* at 215.  The lots were separated from Frei Farm only by the Lava Flow road.  *Id.* at 187 (showing plat for the development relative to Lava Flow road and Frei Farm).  At the time of the City Council meeting, "dirt work" had already started on some of the lots, and the developer explained they would suffer financially because of the tower's impact on the view lots.  *Id.* at 215.  Although photo simulations from that area showed the tower was in plain view with no natural screening, Admin. Rec., at 40–41 (ECF No. 35), Verizon did not address the distance to those homes, nor did it address the visual and financial impact on those view lots.  Neither did the City when determining if Frei Farm was the least intrusive alternative.

---

[17]   In 2017, when the City was addressing the application, millennials would have ranged in age from 13 to 35.  Sunbrook is an upscale community.  It is questionable how many 13 to 35-year-olds were purchasing in that community.

24

ii.    *Arrowhead Elementary School*

Arrowhead is about three-tenths of a mile north of Frei Farm.  Admin. Rec., at 6 (ECF No. 36).  Verizon reported that Arrowhead presented the second-best option from an RF perspective.  *Id.* at 57.  The following shows the balance Verizon anticipated among the Arrowhead cells after offload of the Santa Clara cell in comparison to Frei Farm:

| Cell | Service Area in Square Miles | |
|---|---|---|
| | **Frei Farm** | **Arrowhead** |
| Santa Clara Cell after offload | 0.9 | 0.4 |
| Proposed Cell 1 | 0.7 | 0.6 |
| Proposed Cell 2 | 2.4 | 2.5 |
| Proposed Cell 3 | 0.9 | 0.8 |

*Id.* at 50, 57 (ECF No. 36) (stating the cell coverage areas).  The balance among the Arrowhead cells is substantially the same as the balance among the Frei Farm cells, but there is a greater offload of the Santa Clara cell.

Nevertheless, Verizon asserted in its application that Arrowhead was not feasible because any "location on the property would put the facility against the fence line of an existing home.  Access would have to go through the school playground and the impact of those items would be greater than the impact at the current proposed location."  *Id.* at 196.  Later, Verizon also reported that its RF study showed a tower at Arrowhead would need to be 100-feet tall to accomplish the same objectives as Frei Farm.  *See id.* at 57; Admin. Rec. at 261 (ECF No. 35).  In support of its position, Verizon provided propagation maps for Frei Farm and Arrowhead showing the comparative effects of a 100-foot, 80-foot, and 60-foot tower on coverage.  Admin. Rec., at 69–75 (ECF No. 35).

25

CityScape concurred that Arrowhead was a viable location from an RF perspective. Indeed, CityScape stated Arrowhead "would provide a greater capacity relief to more of Santa Clara" than Frei Farm.  Admin. Rec., at 6 (ECF No. 36).  Its observation is supported by the following Arrowhead load capacity map:



**Frei Farm**                                    **Figure 7 - Arrowhead**

Admin. Rec., at 50, 57 (ECF No. 36).  The cells in the Arrowhead tower would have worked together to offload two of the cells in the Santa Clara tower.  It is not just the purple area that would have been offloaded.  The dark green area would have been offloaded as well.  This means instead of needing to adjust that second cell in the Santa Clara tower to take on more capacity, the Arrowhead tower would have *offloaded* that second cell.  Thus, the Santa Clara tower and Santa Clara itself would have benefitted more from the Arrowhead tower than from Frei Farm.  That was not taken into consideration when considering if the Frei Farm tower was the least intrusive.

CityScape further noted that although Verizon had asserted "the only location at Arrowhead School was at the back of the property next to homes and need [for] greater height," such assertions were without explanation.  Admin. Rec., at 6 (ECF No. 36).  Verizon did not disclose the elevation it used when creating the propagation and load capacity maps.  Before this court, Verizon asserted Petitioners' arguments about the missing "elevation information [is] not material and [a] simply red herring[] to try and distract the Court."  Mem. in Opp'n, at 17 (ECF No. 72).  Yet, CityScape reported that the elevation at Arrowhead was "45 feet to 49 feet higher than Frei Farm."  Admin. Rec., at 5 (ECF No. 36).  Thus "[a] 50-foot antenna elevation would be equivalent to approximately 100-feet at Frei Farm."  *Id.* at 6.  This means the 100-foot tower at Arrowhead could be lowered to 50-feet and obtain the same coverage that was reported for a 100-foot tower if Verizon failed to account for the elevation difference.

Moreover, prior to issuing its report, CityScape asked why the site must "be against the fence line?  Why not a flagpole at the school building front or parking lot?"  *Id.* at 38.  Verizon reported that "a flagpole design would not be capable of handling the equipment needed for this site," but did not explain why.  Admin. Rec., at 261 (ECF No. 35).  CityScape maintained after this response that Arrowhead continued to be a viable location.  Admin. Rec., at 6 (ECF No. 36).

Then, on May 4, 2021, Jared White from Verizon sent an email to the City, stating that Washington School District would not approve a facility at Arrowhead because that site had inadequate grounds for placement.  *Id.* at 26.  Mr. White explained:

> The front of the school has very little space so the site would either need to be in the parking lot where they do not have a lot of space and where it would interfere with pick up and drop off or landscaping would need to be removed and it be placed near the building which they do not want.  The site cannot go in the playground area nor can it go [in] the middle of the field.  The only

27

> other options would be up against the property line but the entire
> school is immediately surrounded by residential homes.

*Id.*  In a different color font, Mr. White then addressed Craig Hammer from the school district, and stated "Craig, I in no way want to misrepresent you or the school district and I realize in this email I am somewhat speaking for you.  If you feel that I have misstated you or the districts feeling on this subject in anyway please correct me."  *Id.*  Mr. Hammer, however, was not copied on the email.  Nor is there any evidence in the record that anyone from Santa Clara made contact with Mr. Hammer about Verizon's representations regarding Arrowhead.

Mr. White also did not address why a flagpole design was not feasible for its equipment even though that design has been used at other locations, nor did he address the question about the tower height.  Instead, at the Planning Commission meeting, Verizon asserted the same facts as before—that the tower would have to be placed at the fence line of resident homes and be 100' tall.  *See* Admin. Rec., 40, 56–57 (ECF No. 36).  Although CityScape provided specific information on which to question Verizon about the location, the Planning Commission did not do so before approving Verizon's CUP application.  *See generally id.* at 89–98.

At the City Council meeting, however, the City Attorney asked Verizon to address the Arrowhead location.  *Id.* at 211.  Mr. White stated, "[t]he problem with Arrowhead Elementary is [it is] much closer to the houses that surround Arrowhead then the houses that surround this site. The only feasible locations at Arrowhead are the back of the property *or the very front portions of the property* and it would be much, much closer to those houses then it is to these at this site." *Id.* (emphasis added).  Mr. White then said, "for the reasons stated," the "Washington School District . . . has already provided written notification to the City that they will not lease Verizon space at Arrowhead Elementary."  *Id.*

28

Despite the inconsistent statements by Verizon about potential locations on the school grounds and CityScape's recommendations, no further questions were asked. No clarification was sought about the height of the tower either. Moreover, although Mr. White referred to written notification from the school district, the record contains no such notification. Nor has Verizon pointed to any notification in the record. It is unknown what options were discussed with the school district and the viability of those options. Finally, Mr. White's argument that Arrowhead was less attractive because of the distance to existing homes failed to take into consideration the distance to the homes in the new subdivision next to Frei Farm that already had "dirt work" starting.

### iii. *Golf Course*

The golf course at Sunbrook is located in St. George, and it has a maintenance yard which Petitioners contend is a viable alternate to the Frei Farm location. Verizon asserted the "Golf Course location is not preferred as it's no better or no worse." Admin. Rec., at 90 (ECF No. 36). Verizon did not provide an RF report because it stated "[c]overage would be very similar to the proposed location." *Id.* at 61. It also asserted the "Site has [a] similar level of Visual Impact." *Id.* at 60. Residents living in the area disagreed with Verizon about the visual impact. The same residents opposing the tower at Frei Farm noted the benefits of the tower at the golf course. They noted that there were "a lot of trees" around the maintenance area that would camouflage eighty percent of the tower and make it less obtrusive. *Id.* at 217. The residents also observed that Verizon was not entitled to the best location, only a location "adequate to solve the current problem," and argued in favor of the golf course location. *Id.*

Even if the location was less objectionable, Verizon asserted there was no access to it. Admin. Rec., at 216 (ECF No. 36).  Before and during the City Council meeting, questions were raised about whether the Lava Flow road may provide access.  Lava Flow road is a well-defined road that runs adjacent to Frei Farm.  Admin. Rec., at 58, 62, 64 (ECF No. 35).  Verizon asserted that the road was private and it provided a letter from Windy Peak (the owner of Frei Farm) stating that Windy Peak would not grant an easement across it.  *Id.* at 36; Admin. Rec., at 216 (ECF No. 36).  Those familiar with the road asserted it was a public road.  On April 26, 2017, Mr. White reported that "Verizon legal is reviewing the access and easement concerns that were voiced."  Admin. Rec., at 37 (ECF No. 36).  At the City Council meeting, Verizon stated that even if the road were public, it would require twenty years of use and then merely result in a prescriptive easement.  *Id.* at 216.

When Santa Clara's Mayor opined there was access, Verizon asserted it was not for the Mayor to opine because it was "up to Verizon Wireless and the City of St. George to determine what type of access is required and permitted to the proposed location in the City of St. George." Admin. Rec., at 29 (ECF No. 36).  At the City Council meeting, however, the Mayor asserted Lava Flow "is a public road and has been for a long time.  It's not dedicated.  It is a public road by use."[18]  *Id.* at 215–16.  He further noted "that on the City Road Master Plan," Lava Flow "changes to an extension of Claude [road]."  *Id.* at 216.

---

[18]  Although public use can establish a road under Utah law, there is a reference in the record about the road being dedicated to public use in the future because of the adjoining 57-unit subdivision.  Admin. Rec., at 29 (ECF No. 36) (asserting Verizon's perspective that "the Mayor of Santa Clara[] should not opine on whether access to the [golf course] would be an issue and whether the access road is to be dedicated in the near future regarding the pending residential development on adjacent private property").

The City's attorney further informed Verizon they were incorrect about Utah law because of its provision about how public roads may be created through public use.  *Id.*  A public road, versus a mere prescriptive easement, may be created through ten years of public use, not twenty. *Id.*  Importantly, however, Lava Flow has not been adjudicated as a public road, nor expressly recognized by St. George as such.  This means access to the maintenance yard was not established.  The exchange shows, however, that Verizon did not sufficiently research the law about Lava Flow road before excluding it as a potential site.

Finally, Verizon asserted St. George refused to lease the site to them.  In late 2016, Verizon left four voicemail messages with the golf director that went unanswered.  Admin. Rec., at 60 (ECF No. 36).  When CityScape questioned Verizon's efforts, Mr. White reported on April 26, 2017, that the golf director had called him that afternoon.  *Id.* at 35.  According to Mr. White, the golf director,

> confirmed that he ran our proposal by Matt Loo director of Golf *who also asked the city administration* and they . . . have all said that they are not willing to lease space to Verizon for a facility anywhere on the sunbrook golf course property, maintenance yard or otherwise.  You may reach out directly to [the golf director] if you wish to confirm this information.

*Id.* (emphasis added).  On April 28, 2017, the Santa Clara City Manager reported that he had called someone in St. George and confirmed "they are not interested in having the tower (regardless of look) on their property by the golf course." *Id.* at 38.

The St. George City Manager, however, reported that he had not been in the loop on these communications.  *Id.* at 186.  Instead, it was only the golf director or Matt Loo, as an Economic Development Specialist, who had the communications with Verizon.  *Id.*  The St. George City Manager learned about the issue on or about May 5, 2017 and expressed a

willingness to "examine options." *Id.* at 29 (emphasis omitted).  Verizon opposed that effort because it was three business days before the Planning Commission. *Id.*

After the Planning Commission approved the permit, the St. George City Manager reached out to Verizon "to see if they would consider the possible location of the tower at the maintenance facility if a location could be agreed upon." *Id.* at 186.  Verizon informed the City Manager that "they were too far along in the process to consider this site again." *Id.* Verizon further asserted merely being willing to discuss a location was too speculative to show the golf course was a feasible alternative. *Id.* at 30.  It is unknown, however, what the outcome would have been had Verizon not left repeated messages with the same person or had it contacted a decision-maker with more authority over the situation earlier in the process.

      iv.    *Alternates 7 and 10 When Taking Location of Alternate 9 into Account*

The court next discusses the interplay between Alternate 9 and Alternates 7 and 10.[19] One of the reasons Verizon rejected Alternate 9 was because "Verizon has another site *in Development very near* this location."  Admin. Rec., at 69 (ECF No. 36) (emphasis added). During the Planning Commission hearing, Petitioners noted "[t]here are other towers 'under development.'  What will coverage be after those towers are completed—what would the impact be of those new towers [on] coverage?" *Id.* at 92. The following comparison shows the relevancy of Petitioners' questions.

---

[19]  Verizon did not do a separate analysis for Alternate 10 because it asserted "[c]overage is the same as Alt 7".  Admin. Rec., at 71 (ECF No. 36).  Because coverage is the same, the analysis for Alternate 7 applies the same for Alternate 10 and the two alternatives are discussed together.



**Figure 8 – Alternate 9**                    **Figure 9 – Alternate 7 (and 10)**

Admin. Rec., at 67, 70 (ECF No. 36).

Alternate 9 is on the south end of the area covered by the Santa Clara cell.  *Id.* at 70.  The

load capacity map for Alternate 9 shows the effect of a tower at that location and how each of its

cells would project partially or fully to the north.  *Id.*  Alternates 7 and 10 are located on the

north end of the relevant area.  Similar to Arrowhead, Alternates 7 and 10 serve Santa Clara well

by offloading two of the cells of the Santa Clara tower.  Alternate 7 is located near a substation

on Dixie Drive and Alternate 10 is on commercial property, neither of which had any noted

zoning issues to overcome.  Admin. Rec., at 67, 71 (ECF No. 36).

Verizon rejected Alternates 7 and 10, however, because they do "not work from an RF

perspective."  Admin. Rec., at 66, 71.  Specifically, Verizon stated the following:

> [Alternate 7] would have two new cells that would serve very large
> areas and require new facilities in the near future.  It also serves the
> area around Dixie & Sunbrook to the south very poorly, with high
> interference. . . . Alternate location 10 is similar.

33

*Id.* at 67.  The following table shows the distribution among the cells in comparison to Frei Farm and Arrowhead:

| Cell | Service Area in Square Miles | | |
|------|------|------|------|
| | **Frei** | **Arrowhead** | **Alternate 7 (and 10)** |
| Santa Clara Cell after offload | 0.9 | 0.4 | 0.8 |
| Proposed Cell 1 | 0.7 | 0.6 | 0.8 |
| Proposed Cell 2 | 2.4 | 2.5 | 1.9 |
| Proposed Cell 3 | 0.9 | 0.8 | 1.8 |

*Id.*  The offload of the Santa Clara cell is in the "ideal" range.  Cell 1 also is in the ideal range. The other two cells cover larger areas that project south.  On the southern end, where Sunbrook Drive is, Verizon said those two cells would cover the area poorly.

When one factors in that a new cell tower is being developed very near Alternate 9, it changes the above analysis.  A tower in that area covers Sunbrook Drive well according to Figure 8, and because a tower in that region would partially project to the north, it appears Cells 2 and 3 in the above table would be reduced in size to about the size of Cell 1.  If so, then by Verizon's own design parameters, Alternates 7 and 10 would provide a better balance than Frei Farm or Arrowhead.  Petitioners raised a legitimate issue.  By not taking into account the new facility to the south, Verizon's information was incomplete and its rejection of Alternates 7 and 10 is problematic.

      v.    *Alternates 4, 5, and 6*

Verizon provided a map that shows the location of the alternate sites.  Admin. Rec., at 53 (ECF No. 36).  It mistakenly lists two locations as Alternate 5.  One is at the golf course and the other is to the east. *See id.*  In a subsequent slide of its PowerPoint presentation, Verizon refers to

the golf course as Alternate 4.  *Id.* at 60.  Consequently, the "Alt 5" at the golf course is the one that is incorrect and should have been labeled "Alt 4."

Unfortunately, when that correction is made, is raises another mistake because the site map has a location to the east labeled "Alt 4."  *Id.* at 53.  There is no PowerPoint slide for that location.  When discussing Alternate 6, however, Verizon stated that the analysis for Alternate 6 was similar to Alternate 4.  *Id.* at 65.  Based on the proximity of those labels on the map, it appears Verizon was referring to the area labeled "Alt 4" and not to the golf course.  To avoid confusion, the court refers to that location as Alternate 4(a).

Verizon rejected Alternates 4(a) and 6 for reasons similar to those stated for Alternates 7 and 10.  *See id.*  Thus, the failure to take into account the tower going in "very near" to Alternate 9 also impacted the analysis for Alternates 4(a) and 6.

Verizon also asserted the offload of the Santa Clara tower was not sufficient at those locations because it left the Santa Clara cell serving a 1.0 square mile area.  *Id.*  Since "just under 1.0 square mile" is the ideal, the offload was very close to *ideal*.  Moreover, the antenna elevations for Alternates 4(a) and 6 were not disclosed despite CityScape noting the absence of that documentation.  Antenna heights are relevant, in part, because they impact the degree of offload of the Santa Clara tower.  "Had [CityScape] known the various antenna elevations for all locations, if the submitted information had been updated or not to the most recent requests, [CityScape's] report could [have been] more conclusive."  Admin. Rec., at 7 (ECF No. 36).  CityScape advised the City to ask about such issues, but there is nothing in the record to show that advice was heeded.

For Alternate 5, Verizon stated, "RF study was not done as site is not allowed per city code."  Admin. Rec., at 63 (ECF No. 36).  Even though it did not do an RF study, Verizon reported that Alternate 5 had RF deficiencies similar to Alternate 6.  *See id.* at 65.  Verizon provided no supporting documentation for that representation.

Verizon further rejected Alternates 4(a), 5, and 6 because St. George ordinances do not allow towers in those locations.  *Id.* at 61, 62, 64.  Yet, Verizon inconsistently argued to Santa Clara that it could not preclude a tower going in at Frei Farm because federal law preempted Santa Clara ordinances.  *Id.* at 135.  If federal law preempted Santa Clara ordinances, then it also preempted St. George's ordinances and that ground should not have been a bar to Alternates 4(a), 5, and 6.

## V.   PHOTO SIMULATIONS

Verizon provided photo simulations of a 60-foot monopole from various views around Frei Farm, the golf course, and areas near Sunbrook.  Admin. Rec., at 32, 38–59 (ECF No. 35); Admin. Rec., at 78 (ECF No. 36).  Verizon also provided photographs of actual 60-foot towers that appear to be located near office or business locations.  Admin. Rec., at 174–76, 178 (ECF No. 36).  Verizon asserted the photographs demonstrate the tower would "be effectively unnoticeable."[20]  Admin. Rec., at 134 (ECF No. 36).

On March 23, 2017, Petitioners sent a letter to the City's counsel that stated, "[t]he view from Sunbrook is a scenic panorama which includes Snow Canyon, the Red Cliffs and Pine

---

[20]   There is an ambiguity in the record.  Verizon's site plan initially showed a three-cell tower when it applied in 2016.  Admin. Rec., at 97 (ECF No. 66).  In 2017, Verizon modified its site plan and changed it to a four-cell tower.  *Id.* at 66.  The increased density is not depicted on the photo simulations, nor is there any other reference to a four-cell tower.  Hence, even though the site plan states it would be a four-cell tower, it appears Verizon only planned a three-cell tower.

Mountain.  It is stunning."  Admin. Rec., at 2 (ECF No. 60).  Petitioners then asserted, "Verizon does not include renderings of the actual view from Sunbrook and the inclusion of the proposed cell tower."  *Id.*

In response, Verizon presented a photograph to the Planning Commission taken from a street in Sunbrook.  Admin. Rec., at 78 (ECF No. 36).  A simulation of the tower was not included on the photograph, but Verizon asserted the photograph showed "it is not likely the tower would [be] visible from this location."  *Id.*  As stated above, Verizon also asserted the tower would not be visible for "the vast majority of Lost Creek Drive and Emeraud."  *Id.* at 80. For those homes where the tower is in view, the visual impact is unknown.  It also is unknown what the visual impact is from the view corridors.

At the Planning Commission meeting, a Sunbrook resident commented, "Sunbrook residents near [him] have a complete view of [Frei Farm] and will be able to see the proposed tower."  *Id.* at 92.  He further noted that Sunbrook "is a community rising up which would allow those living on the hill to easily see the tower.  This . . . is not flat land as was shown in the stealth slides."  *Id.* at 91.  CityScape asked if a balloon test had been done "to determine 'view sheds.'"  *Id.* at 92.  The record does not reflect the answer, but it does show no balloon tests are in the administrative record.

While deliberating whether the CUP should be approved, the commission chair and the City's counsel noted that because of federal law, their "hands [were] tied" on the issue of whether the tower would be "detrimental to health, safety or welfare *or aesthetics or detrimental to improvements to the area*."  *Id.* at 94, 96 (emphasis added); *see also id.* at 87 (noting members of the commission).  Thus, even if pictures had been taken from the view corridors or a balloon

test had been done, the Planning Commission thought Federal law preempted the issue of

aesthetics and property impact.

On May 19, 2017, after the Planning Commission approved the CUP application,

Petitioners appealed to the City Council.  Admin. Rec., at 100 (ECF No. 36).  The day before the

City Council meeting, Petitioners sent another letter to the City's attorney stating:

> As noted in that March letter, a critical component of Santa Clara
> ordinance is that the cell tower must be "effectively unnoticeable."
> In addition to failing for reasons I previously outlined, to date,
> Verizon has not provided mock ups of the views from Sunbrook.
> Those mock ups should include views of Snow Canyon, the Red
> Cliffs and Pine Valley Mountain. The materials provided by
> Verizon include only a rendering from across the river from the
> subject site and not from the many other locations *within the view
> corridor* in the Sunbrook development. Sunbrook *slopes up from
> the river and thus includes many vantage points* other than that
> which was provided by Verizon. Without actual renderings of the
> actual views from Sunbrook (including various locations within
> that view corridor), the City is not in a position where it can make
> a decision on whether the tower would in fact be "effectively
> unnoticeable."

*Id.* at 112.

Verizon argued at the City Council meeting that they did the photo simulations from the

locations specified by the Petitioners, and that they would have done more but for the fact that

the Petitioners waited until the day before the City Council meeting to state the relevant photo

simulations had not been done.  Admin. Rec., at 134–35 (ECF No. 36).  It is true that Petitioners

waited until the day before the City Council hearing to state more completely what it meant

when they requested pictures from Sunbrook.  In light of the March 23rd letter, comments made

by a Sunbrook resident at the Planning Commission, the absence of a balloon test, and the layout

of Sunbrook itself, it is questionable that Verizon failed to understand the significance of the view corridors until the day before the City Council meeting.

The City Council concluded, however, that the record showed the City's regulation on aesthetics and property impact had been met.  Admin. Rec., at 4–5 (ECF No. 35).  It provided no explanation for its conclusion, *see id.*, even though (1) it had made contrary findings in its 2016 Decision, (2) the Planning Commission had made no findings on aesthetics or property impact in its 2017 Decision, and (3) the photo simulations from the 57-unit subdivision showed a highly-visible tower.  The City then imposed conditions to mitigate the detrimental impact of the tower. *Id.* at 5–7.

## ANALYSIS

### I.    JURISDICTION

#### A.    Federal Question

The City removed this action on the ground that "this matter involves questions of federal law."  Notice of Removal, at 2 (ECF No. 2).  Courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted).  Petitioners refer to federal law throughout their Amended Complaint, but none of their causes of action assert a federal law claim.  *See generally* Amended Complaint (ECF No. 21).  The court must determine if federal-question jurisdiction is applicable.

Typically, "federal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law."  *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312 (2005).  It may also be invoked under "another

longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction." *Id.* (citation omitted). A federal court may "hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* (citation omitted). The United States Supreme Court has cautioned, however, that this doctrine does not include "the expansive view that mere need to apply federal law in a state-law claim will suffice to open the 'arising under' door." *Id.* at 313. Instead, such "jurisdiction over state-law claims" must "really and substantially involve a dispute or controversy respecting the validity, construction or effect of federal law." *Id.* (citation and alterations omitted). Thus, the court must determine if this case involves the mere need to apply federal law, or if there is a substantial controversy about the nature of that federal law.

Petitioners raise federal law issues for several reasons. Verizon contends federal preemption under 47 U.S.C. § 332(c)(7)(B)(i)(II) comes into play even when a wireless provider only seeks to increase internet speeds. According to Verizon, it need not show any deficits in voice service. Verizon cited no case with that holding. Instead, it relies upon a 2015 FCC order (the "2015 Declaratory Ruling"). Petitioners' disagree with Verizon's interpretation of the 2015 Declaratory Ruling and ask this court to determine if a significant gap in coverage may be found solely on the basis of a provider's desire to increase internet speeds for its network. A substantial controversy exists on this matter. It permeates the analysis and approval of the tower depended, in part, on the City finding a significant gap in data capacity. The court is not merely applying federal law to address Petitioners' state law questions. It is construing and determining

40

the effect of the 2015 Declaratory Ruling on federal preemption under Section 332.  The court

therefore concludes it has federal-question jurisdiction.

> **B.**     **Standing**

Although Verizon did not raise standing before this court, it did raise the issue before the

City.  Admin. Rec., at 33 (ECF No. 36).  Accordingly, the court also addresses standing sua

sponte because it "raises jurisdictional questions." *Rector v. City & Cty. of Denver*, 348 F.3d

935, 942 (10th Cir. 2003) (citations omitted).

> To satisfy constitutional standing requirements, a plaintiff must
> demonstrate the presence of three elements: (1) injury in fact—
> meaning the invasion of a legally protected interest that is (a)
> concrete and particularized, and (b) actual or imminent, not
> conjectural or hypothetical; (2) a causal relationship between the
> injury and the challenged conduct—meaning that the injury can
> fairly be traced to the action of the defendant; and (3) a likelihood
> that the injury will be redressed by a favorable decision—meaning
> that the prospect of obtaining relief from a favorable ruling is not
> too speculative.

*Id.* (citation and alteration omitted).  "[S]tanding is determined at the time the action is brought."

*S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quotations and citation

omitted).

In 2016, the City concluded that a 100' tower at Frei Farm would cause harm by

negatively impacting aesthetics and nearby residential property values.  Petitioners contend even

though Verizon lowered the proposed tower height to 60' in 2017, the change in height did not

alter the negative effects of the tower.  Verizon argued to the City, however, that it should not

consider the issues raised by Petitioners because they were residents of St. George and lacked

standing to challenge a decision by the City.  Admin. Rec., at 33 (ECF No. 36).  In essence,

Verizon asserted that Petitioners do not have a legally protected interest; and therefore cannot satisfy the first element for standing.

To obtain a CUP in Santa Clara, an applicant must show "the use will not be detrimental to the . . . aesthetics, or detrimental to improvements *in the area*." Santa Clara City Code § 17.40.060(B) (emphasis added). In contrast, the applicant also must show the use "will contribute to the general well being of *the City*." *Id.* § 17.40.060(A) (emphasis added). If the City had meant to limit harm only to those in the City, it would have so specified in the same manner that it limited the "well-being" requirement only to the City. Instead, its ordinance reflects that when an applicant is going to build a structure that is contrary to zoning in the area, the applicant bears the burden to show it will not cause harm to those in the area. Moreover, Santa Clara City Code § 17.40.100 states, "*[a]ny person* shall have the right to appeal the decision of the Planning Commission." (Emphasis added.) The court therefore concludes the City properly allowed St. George residents to challenge approval of the CUP based on Petitioners' standing.[21]

## II.   STANDARD OF REVIEW AND BURDEN OF PROOF

### A.   Standard of Review

This is an appeal of a final land use decision rendered by the Santa Clara City Council, which affirmed the approval of a conditional use permit. Utah law mandates that on appeal, "[a]

---

[21] Although not determinative of Petitioners' standing, the court notes the tower did not present a problem only to St. George residents. Residents of Santa Clara also opposed the tower based on aesthetics and concerns about the impact on their property value. Admin. Rec., at 214 (ECF No. 36) (noting concerns by those who live on Claude Drive, which is in Santa Clara); Admin. Rec., at 8–9 (ECF No. 60) (noting some Santa Clara residents who protested the location of the tower).

court shall . . . presume that a final land use decision of a land use authority or an appeal authority is valid." Utah Code Ann. § 10-9a-801(3)(b)(i). Moreover, a court must "uphold the land use decision unless the land use decision is: (A) arbitrary and capricious; or (B) illegal." *Id.* § 10-9a-801(3)(b)(ii). Utah code defines the relevant terms as follows:

> (i) A land use decision is arbitrary and capricious if the land use decision is not supported by substantial evidence in the record.
>
> (ii) A land use decision is illegal if the land use decision is:
>> (A) based on an incorrect interpretation of a land use regulation; or
>> (B) contrary to law.

*Id.* § 10-9a-801(3)(c)(i)–(ii). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to persuade a reasonable mind." *Checketts v. Providence City*, 2018 UT App 48, ¶ 18, 420 P.3d 71, 77 (quotations and citation omitted). Courts consider "all the evidence in the record, both favorable and contrary, and determine whether a reasonable mind could reach the same conclusion as the land use authority." *Id.* (quotations, citation, and alterations omitted). In doing so, courts do not "weigh the evidence anew or substitute [their] judgment for that of the municipality." *Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 24, 979 P.2d 332, 337 (citations omitted).

## B.  Burden of Proof

In Utah, "the law has long assigned the burden of proof to the petitioner, plaintiff, or appellant" in most situations. *Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 59, 435 P.3d 179, 189 (citations omitted). Verizon asserts Petitioners have attempted to shift the burden of proof to it when it was Petitioners' burden to come forward with contrary evidence.

Verizon bore the burden of proof before the Planning Commission.  Although the Santa Clara City Code does not specify, the court concludes the burden must be met by a preponderance of the evidence for a conditional use permit to issue.  *See Kilgore Companies v. Utah Cty. Bd. of Adjustment*, 2019 UT App 20, ¶ 17, 438 P.3d 1025, 1029 (applying preponderance of the evidence standard based on Utah County Land Use Ordinance).  Once the Planning Commission approved the CUP, the burden shifted to Petitioners to show the approval was arbitrary and capricious or contrary to law.  Petitioners contend the approval was erroneous, in part, because Verizon failed to come forward with evidence to satisfy all of the elements for a CUP in an open space.

Both the United States Supreme Court and Utah Supreme Court have stated:

> As in *Celotex*, we hold that . . . where the burden of production falls on the nonmoving party, we clarify that the moving party may carry its burden of persuasion without putting on any evidence of its own—*by showing that the nonmoving party has no evidence to support an essential element of a claim*.

*Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581, 584 (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  This means "a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted).  This is so not because the burden of proof was improperly shifted by a movant, but because the nonmovant failed to satisfy its requisite burden in the first place.  In other words, "[i]f a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues

concerning all other elements of the claim and any defenses become immaterial." *Id.* at 670 (citing *Celotex Corp.*, 477 U.S. at 322–23).

Although the *Celotex* standard was stated in the context of summary judgment, and this case is an appeal of a land use decision, the court concludes that Petitioners may satisfy their burden in the same manner.  To conclude otherwise would allow the party who has the initial burden of proof to prevail even if that party never put on evidence or put on insufficient evidence to prove a required element. Accordingly, Petitioners may show the City's decision was erroneous based on evidence in the administrative record or based on a showing that Verizon failed to present evidence sufficient to prove an essential element of the applicable law.

## III.   FEDERAL LAW AND PREEMPTION

### A.   FCC History on Telecommunications

In 1934, Congress passed the Communications Act and created the Federal Communications Commission ("FCC") for the,

> purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges.

*Nat'l Broad. Co. v. United States*, 319 U.S. 190, 214 (1943) (quoting Section 1 of the Communications Act, Act of June 19, 1934, 73 Cong. Ch. 652, 48 Stat. 1064, *codified as amended at* 47 U.S.C. § 151 *et seq.*).  From its outset, the act distinguished among different types of communications and the corresponding degree of regulatory control.  For example, Title I of the act regulated "the use of radio frequencies by prohibiting such use except under license." *F.C.C. v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940).   This precluded one

broadcaster from using "a given frequency in disregard of its prior use by others." *Id.* Although radio frequencies were controlled through licensing, the Communications Act "recognize[d] that the field of broadcasting [was] one of free competition." *Id.*

In contrast, Title II of the act regulated telephone and telegraph services. Congress classified them "as a common carrier activity" and regulated them more stringently similar "to the regulation of rail and other carriers." *Id.* Congress directed that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication services, shall be just and reasonable," and that if any common carrier activity was "unjust or unreasonable," then it was "declared to be unlawful." Communications Act, 48 Stat. 1064, § 201(a). Congress gave the FCC the authority to evaluate whether a carrier has imposed just and reasonable charges or practices, and to impose fines for violations of the act. *Id.* § 205.

In 1996, Congress revised portions of the Communications Act through enactment of the Telecommunications Act (the "TCA"). *See* Pub. L. 104-104, 110 Stat. 56. The purpose of the TCA was "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunication technologies." *Id.* at Introduction.

As to the internet, Congress found that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens." 47 U.S.C. § 230(a)(1). It further found that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." *Id.* § 230(a)(4). Consequently, it adopted a policy "to promote the continued development of the

Internet and other interactive computer services and other interactive media," and "to preserve

the vibrant and competitive free market that presently exists for the Internet and other interactive

computer services, unfettered by Federal or State regulations." *Id.* § 230(b)(1)–(2).

"The [TCA] subjects telecommunications carriers, but not information-service providers,

to Title II common carrier regulation." *Verizon v. F.C.C.*, 740 F.3d 623, 630 (D.C. Cir. 2014)

(citing 47 U.S.C. § 153(53); *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Srvs.*,

545 U.S. 967, 975–76 (2005)). Unfortunately, the act failed to state how internet services should

be classified, so the FCC has been inconsistent in its approach.

> Traditionally, internet access service providers—first with dial-up access and then digital-subscriber line (DSL) services dominating the market—were telephone companies, conveniently already under the regulatory scope of the FCC. With the rise of cable modem services for [high-speed] internet access, though, the FCC sought to clarify certain terms defined in the Communications Act.

Anna J. Zichterman, *Developments in Regulating High-Speed Internet Access: Cable Modems,*

*DSL, & Citywide Wi-Fi*, 21 Berkeley Tech. L.J. 593, 593 (2006).

In 2002, the FCC issued a Declaratory Ruling wherein it "found that government

regulation of cable modem services was not required and in fact may inhibit further investments

in research and development in the area of high-speed internet access." *Id.* at 594 (citing *In re*

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17

F.C.C.R. 4798, 4802–03 (2002)) (hereinafter "2002 Declaratory Ruling"). It further "concluded

that broadband Internet service provided by cable companies is an 'information service' but not a

'telecommunications service' under the [TCA], and therefore not subject to mandatory Title II

common-carrier regulation."[22]  *Brand X Internet Servs.*, 545 U.S. at 977–78 (citing 2002 Declaratory Ruling 4821–4822, ¶¶ 36–37).  The Supreme Court affirmed the FCC's interpretation and classification.  *See id.* at 1002–03.

Subsequently, the FCC "classified other types of broadband service, such as DSL and mobile broadband service, as integrated offerings of information services without a standalone offering of telecommunications."  *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 692–93 (D.C. Cir. 2016) (citing *In re Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 F.C.C. Rcd. 5901, 5901–02 ¶ 1 (2007) (other citation omitted)).

The FCC switched course in April 2015 when it issued its Open Internet Order.  *In re Protecting and Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5682–83 (2015), 2015 WL 1120110.  The 2015 Declaratory Ruling contains three provisions relevant to this dispute.  "First, the Commission reclassified both fixed and mobile 'broadband Internet access service' as telecommunications services."  *United States Telecom Ass'n*, 825 F.3d at 695 (citation omitted).  The reclassification moved such services from Title I to Title II, thereby allowing the FCC to impose more regulations on broadband providers.

Second, the FCC "reclassified mobile broadband service, which it had previously deemed a 'private mobile service,' exempt from common carrier regulation, as a 'commercial mobile service,' subject to such regulation."  *Id.* (citation omitted).  Finally, it changed the definition of "interconnected service."  The TCA defines an interconnected service as a "service that is

---

[22]  The FCC's classification was consistent with how the FCC had previously "distinguished between 'basic' service (like telephone service) and 'enhanced' service (computer-processing service offered over telephone lines)."  *Brand X*, 545 U.S. at 976–77 (citation omitted).

interconnected with the public switched network (as such terms are defined by regulation by the Commission)."  47 U.S.C. § 332(d)(2).  The FCC previously had "defined the 'public switched network' as a set of *telephone* (cellular and landline) networks, with users' ten-digit telephone numbers making up the interconnected endpoints of the network."  *United States Telecom Ass'n*, 825 F.3d at 714 (emphasis in original).  In the 2015 Declaratory Ruling, the FCC redefined the term "to include both users reachable by ten-digit phone numbers *and* users reachable by IP addresses.  *Id.* at 716 (emphasis in original) (citing 30 F.C.C. Rcd. at 5779 ¶ 391).  This change brought mobile broadband services fully within the definition of a commercial mobile service. *Id.*

Approximately two years later, in May 2017, the FCC issued a notice of proposed rulemaking wherein it stated it intended to revert back to the classifications and definitions in place prior to the 2015 Declaratory Ruling.  *In re Restoring Internet Freedom*, WC Dkt. No. 17-108 (May 23, 2017).  In January 2018, the reversion became final, and the rules governing mobile broadband services are again governed by Title I.  *In re Restoring Internet Freedom*, 33 F.C.C. Rcd. 311 (2018)  ("We reverse this misguided and legally flawed approach and restore broadband Internet access service to its Title I information service classification.  We find that reclassification as an information service best comports with the text and structure of the Act, Commission precedent, and our policy objectives.").

With this history in mind, the court must now determine what it means in the context of Verizon's application.  Verizon filed its application in January 2017.  The Santa Clara Planning Commission approved the application in May 2017, and the City Council affirmed the approval in July 2017.  Although the FCC had provided notice by then that it intended to revoke the 2015

Open Internet Order, such revocation did not occur until January 2018.[23]   Hence, the court concludes the 2015 Declaratory Ruling is applicable to this determination.

The TCA provides that "'personal wireless services' means commercial mobile services" and "'personal wireless service facilities' means facilities for the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(C)(i)–(ii).  Because Verizon filed its application during the window when the 2015 Declaratory Ruling was in force, it was classified as a commercial mobile service.  As a commercial mobile service rather than a private mobile service, Verizon fell within the definition of "personal wireless services" and "personal wireless service facilities" in 2017.  As such, it had the opportunity to claim federal preemption over state and local zoning ordinances to effectuate expansion of its network.  The TCA's preemption provision states:

> (A) General authority.   Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
> (B) Limitations.
> (i) The regulation of the *placement, construction,* and modification of *personal wireless service facilities* by any State or local government or instrumentality thereof—
>> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>> (II)  shall not prohibit *or have the effect of prohibiting the provision of personal wireless services.*

---

[23]  Petitioners assert the January 2018 rule change should be applied retroactively because it was only to clarify the law.  An order "operates retroactively when it seeks to impose new legal consequences to events completed before its announcement."  *De Niz Robles v. Lynch*, 803 F.3d 1165, 1168 (10th Cir. 2015) (quotations and citation omitted).  There is a presumption against retroactivity.  *Id.* at 1170.  The FCC did not specify it intended the 2018 rule change to apply retroactively—it only said it was reversing the 2015 Declaratory Ruling and then specified how mobile broadband would be classified in the future.  Nevertheless, because the court concludes federal preemption is inapplicable in this matter, even when the 2105 Declaratory Ruling is applied, the court does not reach the issue of retroactivity.

47 U.S.C. § 332(c)(7)(A)–(B)(i) (emphasis added).  Verizon argued to the City that denying a CUP to place a facility at Frei Farm would result in an effective prohibition on Verizon providing personal wireless services in the relevant area.  Accordingly, Verizon asserted any Santa Clara ordinance prohibiting placement of the facility at Frei Farm was preempted.

### B.    Definition of Effective Prohibition

"[T]he TCA provides no guidance on what constitutes an effective prohibition, so courts, . . . have added judicial gloss."  *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 48 (1st Cir. 2009) (citations omitted).  A "carrier has the burden to show an effective prohibition has occurred."  *Id.* (citations omitted).  "When a carrier claims an" application denial would result in "an effective prohibition, virtually all circuits require courts to (1) find a 'significant gap' in coverage exists in an area and (2) consider whether alternatives to the carrier's proposed solution to that gap mean that there is no effective prohibition."  *Id.* (citations omitted).  That said, circuits still disagree about "the language they use to measure when a significant gap exists and about the inquiry into alternative solutions."  *Id.*  Thus, the relevant inquiry is specific to the circuit in which the action lies, but it may be informed by other circuits.  Moreover, the statutory and regulatory context also must be considered to ensure any judicial interpretation is consistent with the intent of Congress and the FCC.

### C.    Significant Gap

When determining if a significant gap exists, the Tenth Circuit has cited the following standard from the First Circuit with approval: "[Verizon] could prevail on its effective-prohibition claim by showing that (1) the denial of a permit [would prevent Verizon] from closing a 'significant gap' in existing services and (2) its proposed facility was the least intrusive

means of doing so." *AT & T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016) (citing *Omnipoint Holdings, Inc.*, 586 F.3d at 48) (other citation omitted).

Although "there are no bright-line rules" when determining if a significant gap exists, potential factors to consider are "the gap's physical size and location, the number of affected customers, dropped-call or failure rates, and whether the purported gap affects a plaintiff's ability to provide outdoor, in-vehicle, and in-building coverage." *Id.* (quotations and citation omitted). Also relevant is the population of the area and whether a gap "straddles a significant commuter highway or a well-traveled road that could affect large numbers of travelers and the people who are trying to communicate with them." *Id.* at 889, 891 (quotations, citations, and alterations omitted). "[H]oles in coverage or 'dead spots' that are limited in number or size do not constitute a *significant* gap in service." *Id.* at 890 (emphasis added) (citations omitted).

     i.    *Closing Gap in Existing Services*

Verizon provided no evidence that it has a gap in voice services. In terms of coverage, Verizon acknowledged the problem is not that the towers cannot transmit far enough. Admin. Rec., at 90 (ECF No. 36). Instead, Verizon seeks to address internet capacity issues or the speed at which internet services are delivered. Verizon's position is unique. Typically, case law has addressed gaps in voice services or gaps in both voice and internet services. Verizon provided no case supporting that internet speed alone may constitute a gap sufficient to preempt state and local ordinances.

The 2015 Declaratory Ruling, however, altered the definition of "public switched network." As stated above, the FCC redefined the term to include "mobile services providers . . . that use" ten-digit phone numbers "*or* public IP addresses, in connection with the provision of

switched services." 30 F.C.C. Rcd. at 5779 ¶ 391 (emphasis added). That change brought mobile broadband services fully within the definition of a commercial mobile service and federal preemption rules. Although not conclusive, for purposes of this decision, the court assumes the 2015 Declaratory Ruling was sufficiently broad to allow for a significant gap to exist based on internet speed even if there was no corresponding gap in voice services.

On the issue of capacity, the record lacks information about (1) the number of customers impacted, (2) the failure rate of being unable to connect to the internet or have applications work, (3) the number of travelers impacted by the gap, (4) whether the gap is along a commuter corridor, and (5) the actual impact on customers accessing the internet outdoors, in-vehicles, or in buildings.

Certainly, Verizon asserted its wireless services were not just for "luxury uses like social media," but also for "[e]mergency services, such as police dispatches and ER patient data preloading from ambulances." Admin. Rec., at 118, 125 (ECF No. 36). Consequently, critical services would benefit from faster and higher quality internet services. *Id.* at 118. While true, Verizon's assertions do not prove a significant gap exists. In other words, a significant gap does not exist every time services can be improved to a faster speed or higher quality.

Although the record is lacking important information, Verizon did show that one cell in a tower covers a large geographical area, and that the cell's performance is at a lower speed. Moreover, Cityscape asserted the load capacity map supported a signal gap sufficient to justify "a new facility under federal law." Admin. Rec., at 270 (ECF No. 35). Based on such information, the court concludes that a reasonable mind could reach the same conclusion as the City that a significant gap in internet services existed due to over-capacity issues.

ii.   *Least Intrusive Means*

Once a court finds that a significant gap exists, it must determine if the proposed tower is the least intrusive means of closing a significant gap in services.  "When evaluating such claims we are in the realm of trade-offs between the carrier's desire to efficiently provide quality service to customers and local governments' primary authority to regulate land use."  *Omnipoint Holdings, Inc.*, 586 F.3d at 51 (quotations and citation omitted).[24]  On the one hand, "[a] carrier cannot win an effective-prohibition claim merely because local authorities have rejected a carrier's preferred solution."  *Id.* at 52 (citations omitted).  On the other hand, "there are limits on town zoning boards' ability to insist that carriers keep searching regardless of prior efforts to find locations or costs and resources spent."  *Id.*

In this case, prior to submitting its application, Verizon had to satisfy itself that the proposed location was suitable to its needs.  It had a survey completed of Frei Farm and surrounding properties in January 2016.  Admin. Rec., at 62 (ECF No. 35).  In June 2016, it had a study completed under the National Environmental Policy Act ("NEPA") to show that a cell tower at Frei Farm would cause no major impact on the environment.  *Id.* at 77.  It also had evaluated the flood potential at Frei Farm.  *Id.* at 244.  Thus, by the time Verizon submitted its second application in January 2017, it had already invested significant time and costs in developing the Frei Farm project.

---

[24]  In *Omnipoint Holdings, Inc.*, the Court noted some circuits use "only feasible plan" language and others use "least intrusive."  *Omnipoint Holdings, Inc.*, 586 F.3d at 50 (citations omitted).  In application, however, the Court stated "[i]t is unclear how much these different articulations of the tests truly differ."  *Id.*  Because the Tenth Circuit previously cited the case with approval in how to determine if a significant gap exists, this court also uses *Omnipoint Holdings* on the standard for determining if a site is the least intrusive.

Having invested that much time and effort, Verizon had an incentive to find fault with alternate sites and to minimize concerns that were raised by others.  Much of its analysis about alternate sites appears to have been outcome driven where the deficits of alternate locations were emphasized while deficits at Frei Farm were omitted.  The record does not support Verizon engaged in a good faith effort as to the alternative sites.

For example, when addressing the Frei Farm site, Verizon asserted multiple times that federal preemption barred application of Santa Clara ordinances.  When addressing potential sites in St. George, however, Verizon was quick to exclude potential sites on the ground that a St. George ordinance precluded a tower in certain locations.  For Alternate 5 in St. George, Verizon reported that no "RF study was . . . done as site is not allowed per city code."  Admin. Rec., at 62–63 (ECF No. 36).  Verizon also noted St. George zoning precluded placement of a tower at  Alternates 6 and 8.  Admin. Rec., at 64, 68.  For the golf course (Alternate 4), Verizon said the location could not be zoned.  *Id.* at 61.  In a moment of candor, Verizon further reported it could not "get [a] CUP in St. George" for that location.  *Id.* at 218.  Yet, if federal preemption truly applied, then St. George's ordinances should not have been a bar to those alternate locations.  It appears Verizon was aware federal preemption did not apply, but nevertheless employed it in Santa Clara.

Verizon also used proximity of the tower to residences to exclude other locations. Admin. Rec., at 56 (stating Arrowhead location would place a facility at the fence line of an existing home); *id.* at 64 (stating Alternate 6 was only 20' from a house).  Yet, on its site plan for Frei Farm, Verizon omitted the distance to the property line when it was noting other measurements. Admin. Rec., at 64–65 (ECF No. 35).  When the adjoining landowner raised concerns about it

only being 13 to 18 feet away, Verizon's response was there is always a level of impact when Verizon is trying to provide the best coverage.  As to the fifty-seven unit subdivision next to Frei Farm, Verizon had no explanation why it was acceptable to place the tower close to those homes and interfere with the planned view lots.

For Alternate 9, the proposed cells would have covered 1.6, 1.1, and 1.2-mile areas respectively.  Verizon characterized this as unacceptable because "*all three* new cells would serve *very large areas* and *require new facilities* in the near future."  Admin. Rec., at 70 (ECF No. 36) (emphasis added).  The ideal is just under 1 square mile according to Verizon.  With two cells close to the ideal and the third almost 1 mile less in size than one of cells at Frei Farm, it is difficult to see how all three cells serve "very large areas."[25]  Moreover, the Frei Farm cell that is 2.4 miles in size also will necessitate a new facility in the near future if the same logic were applied.  This is further supported by the fact that Verizon used the single cell in the Santa Clara tower to argue a new facility was needed.  Verizon, however, did not report that likelihood when arguing why Frei Farm was best.

Additionally, Verizon's reported due diligence was questionable.  Mr. White reported Verizon legal had looked into the access issues at the golf course.  Yet, Verizon somehow failed to learn about a prominent Utah law concerning public roads.  Verizon reported it engaged in exhaustive efforts because it left four voice-mail messages with the St. George golf director.  Verizon made no effort, however, to contact anyone higher in St. George's administration.  When the St. George City Manager was finally brought into the loop, he reached out to Verizon

---

[25]   The court recognizes that Alternate 9 was not an appropriate site because another Verizon tower was being developed very near it.  The court highlights Verizon's arguments only to show that Verizon exaggerated the faults of alternative sites while downplaying the deficits at Frei Farm.

about potentially placing the tower at the golf course.  Verizon shut down all such discussion because the tower at Frei Farm was too far down the road.  And yet during the same time frame, Verizon purportedly was in good faith discussions with the school district about whether it could lease property at Arrowhead.  *Cf* Admin. Rec., at 31 (ECF No. 36) (objecting to late involvement of golf course on May 5, 2017) *with id.* at 26 (stating on May 4, 2017 that Verizon had just had discussions with the school district about leasing property). If Verizon truly was still in good faith discussions about Arrowhead, it is questionable why Verizon was too far down the road to have similar discussions about the golf course.

Turning to the load capacity maps for Frei Farm and Arrowhead, Verizon asserted Arrowhead was second best from an RF perspective.  Verizon omitted from its presentation that it was shifting part of the load off of one cell in the Santa Clara tower and onto another to make Frei Farm work.  In contrast, the Arrowhead load-capacity map showed that Arrowhead would have offloaded both cells in the Santa Clara tower.  Such effect was ignored by Verizon in its presentation and not addressed by the City.

Moreover, even though CityScape informed the City that Arrowhead would be more beneficial to the City, it does not appear the City gave a critical look at the site.  Verizon represented that the school district would not lease to them.  When Windy Peak would not grant an easement, Verizon provided a letter from the company to confirm.  Verizon provided no similar information for Arrowhead.  The only thing in the record is (1) Mr. White purportedly including the school district on an email, when in fact the school district was not included, and (2) Mr. White reporting there was a letter from the school district declining to lease the property when there is no letter in the record making such a report.  Verizon contends its representation

alone constitutes substantial evidence.   Mem. in Opp'n, at 31 (ECF. No. 72). Not so. Representing what another has said, with no corresponding confirmation, is not substantial evidence.  Indeed, it does not constitute evidence at all.

Nor did Verizon explain why a flagpole design at Arrowhead could not support its equipment when flagpole designs have been used at other locations.   Verizon also failed to provide antenna elevations for the alternate locations.  During briefing Verizon represented to the court that such an issue was immaterial and a red herring.  Yet, CityScape noted the omission and stated that the omission impacted the viability-analysis for alternate sites.  For Arrowhead, in particular, Verizon never addressed why a 100-foot tower was necessary when the elevation at Arrowhead was about 50-feet higher than at Frei Farm.  The propagation maps, showing the comparison between Frei Farm and Arrowhead, are ineffectual without this information.

When Verizon balked at providing more information, CityScape informed the City that the requested information was "within the parameters of reasonable satisfaction for the City to make a qualified decision."  Admin. Rec., at 270 (ECF No. 35).  CityScape further noted that "[a]nyone can see the frustration Verizon is showing," but the "questions raised by the citizens from the hearing . . . were good and reasonable questions, all which are within the ordinance, yet omitted from the Verizon narrative."  *Id.*

Indeed, Petitioners pointed out to the Planning Commission that Verizon had failed to factor into the analysis a tower that was about to come on-line and how that would impact coverage and capacity.  Had the City heeded what CityScape or the Petitioners had said, the data for Alternates 7 and 10 likely would have been different, as well as the data for Alternates 4(a) and 6.

Considering the record as a whole, the court concludes a reasonable person would have questioned why St. George zoning requirements precluded placement of a tower, but Santa Clara zoning was inapplicable due to federal preemption. A reasonable person would have asked what impact the new facility near Alternate 9 would have on Alternates 7 and 10, particularly since there were no zoning problems to overcome at those commercial locations. A reasonable person would have asked Verizon to explain what elevations were used when Verizon did its propagation and load capacity maps for Arrowhead. Such a person also would have noted that all the representations about the school being unwilling to lease were made by Verizon without corroboration from the school district. A reasonable person would have asked Verizon to explain why a flagpole design was not feasible at Arrowhead when such a design had been used at other locations. A reasonable person would have heeded the advice of its own expert that the Frei Farm project was less beneficial to Santa Clara than Arrowhead, particularly when the load capacity maps showed Verizon was shifting part of the load to another cell in the Santa Clara tower to make the Frei Farm project work. A reasonable person would have viewed the close proximity of the 57-unit subdivision to Frei Farm and questioned why Frei Farm was less intrusive than Arrowhead or the other alternative sites when (1) the record contained photo simulations showing the tower was highly visible to the 57-unit subdivision; (2) the Arrowhead Elementary School had already impacted the view of neighboring residences, and (3) Alternates 7 and 10 were at commercial property with no zoning issues.[26]

---

[26]   To the extent the City believed that Verizon was entitled to the best alternate and that the City could not require Verizon to utilize an alternative site that was not ideal but still viable, such a belief was erroneous as a matter of law.

For all of these reasons, the court concludes Verizon failed to show that Frei Farm was the lease intrusive means to close a service gap.  Having failed in that effort, federal preemption was inapplicable and did not bar application of local zoning ordinances.  The court now addresses whether Verizon met the requirements for a CUP under state and local laws.

## IV.    SANTA CLARA ORDINANCES

### A.    Applicable Standards

Santa Clara City Code § 17.40.060 addresses conditional use permits and sets forth the following requirements:

> In approving a conditional use permit, the planning commission shall find:
>
> A.    That the proposed use is necessary or desirable *and* will contribute to the general well being of the City;
>
> B.    That the use will not be detrimental to the health, safety, welfare, or aesthetics, or detrimental to property or improvements in the area . . . .

(Emphasis added.)

When granting municipalities the authority to adopt land use ordinances, the State mandated that any "land use authority shall approve a conditional use if reasonable conditions are proposed, or can be imposed, to mitigate the reasonably anticipated detrimental effects of the proposed use in accordance with applicable standards."  Utah Code Ann. § 10-9a-507(1)–(2)(a)(i).  Such mitigation, however, "does not require elimination of the detrimental effects." *Id.* § 10-9a-507(2)(a)(ii).  Rather, the standard is substantial mitigation of "the reasonably anticipated detrimental effects." *Id.* § 10-9a-507(2)(c).

**B.      Benefit to Santa Clara**

The first factor for a CUP requires evidence that the Frei Farm tower would benefit Santa Clara.  One cell in the Santa Clara tower served a 4.9 square mile area.  Verizon's evidence showed that the geographical area would be reduced to a 0.9 square mile area if the Frei Farm tower were built.  The area of offload largely pertained to St. George, but CityScape opined that Santa Clara also benefitted from the offload.

As stated above, however, when Verizon presented its load capacity map showing the offload from the proposed  Frei Farm tower, the map also showed that the geographical area of a second cell in the Santa Clara tower increased in size.  Because the second cell also serves a portion of St. George, the net effect on the Santa Clara tower should have been taken into consideration when determining the benefit to Santa Clara.  This was not done.

**C.      Aesthetics and Property Values**

Petitioners have argued about the aesthetic impact of the tower.  It is understandable that when a tower is built in an open space and within carefully planned view corridors or view lots, there may be an aesthetic impact.  As stated above, Utah law does not require elimination of all detrimental impacts.  It only requires substantial mitigation of anticipated impacts.

Verizon bore the burden of proof by a preponderance of the evidence that a tower at Frei Farm satisfied the above requirements.  It provided photo simulations from various locations, and it agreed to camouflage the tower.  Once it came forward with that evidence, the burden shifted to Petitioners to show that detrimental aesthetics impacts remained.   Under the Telecommunications Act, "mere generalized concerns are insufficient to create substantial evidence." *U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla.*, 180 F. App'x

791, 794 (10th Cir. 2006) (quotations, citations, and alterations omitted).  The same is true under Utah law.  *Staker v. Town of Springdale*, 2020 UT App 174, ¶ 33, 481 P.3d 1044, 1052 (stating "'public clamor' is not a legally sufficient basis for denying a conditional use permit") (quotations, citation, and alterations omitted)).

Under Utah law, however, "[i]t is not improper to 'solicit' and rely on information which may be furnished by other landowners in the vicinity of the subject property at a public hearing . . . so long as the decision is not *solely* based on the public's concerns or consent."  *Id.* (emphasis in original) (quotations and citation omitted).  Moreover, a developer with knowledge about his or her own project stands on different footing.  *See Kilgore Companies.*, 2019 UT App 20, ¶ 19 (stating testimony of a plant manager was appropriate to consider because such testimony is by a "qualified witness[] with personal knowledge of the Plant's operations").  Petitioner Menlo Smith was one of the principal developers of Sunbrook.  Admin. Rec., at 212 (ECF No. 36).  He has personal knowledge about the view corridors.  The developer of the 57-unit subdivision next to Frei Farm has personal knowledge about his development and how view lots would be impacted by a structure within those views.  Their statements about such items stand on the same footing for their projects as Verizon's engineer did when providing information about Verizon's operations—meaning such statements may not be dismissed as mere generalized concerns.  To the extent that was done by the City, it constituted legal error.  As with all evidence, however, the fact-finder may determine the weight to give such evidence.

Specifically regarding property values, Verizon asserted in its briefing that it "was not required by the Code, state law, or the TCA to provide any evidence of property values in

support of the Facility, and the law does not require it."  Mem. in Opp'n, at 27 (ECF No. 72).[27]

The cases Verizon cited for this proposition do not address Utah law or Santa Clara ordinances, and Verizon made no effort to address the relevant local ordinance.

If a home decreases in value, that is a detrimental impact to property contrary to Santa Clara City Code § 17.40.060(B).  The homeowners were not required to come forward with such information.  Verizon bore the burden to show its project did not detrimentally impact property. It did not do so.  There is a difference between Verizon opining on its own project versus opining on a subject not within its purview.  Thus, Verizon had to do more than simply state property values would not be impacted because Verizon lowered the tower height and camouflaged the tower.  While camouflaging may have improved the appearance of the tower, the girth itself was a concern for those with view lots.  Verizon never said the tower would not be in view.  It merely said it would not be in view for most residences.  No one from Verizon or the City showed the impact on those residences where the tower would be in view.  Absent that information, it is unknown if the conditions imposed by the City substantially mitigated the reasonably anticipated detrimental impact to property.

Additionally, to show property values would not be impacted, Verizon had to do more than present a *generalized* study about homeowners desiring good cell coverage.  The *Money* study relied on by Verizon and the City was insufficient as a matter of law to satisfy the

---

[27]   Verizon also asserted, "[a]s set forth in the Court's Memorandum Decision, Petitioners *cannot* show they will suffer any irreparable harm as a result of the 2017 Decision *or*, thus, *they are entitled to any relief*."  Mem. in Opp'n, at 33 (ECF No. 72) (emphasis added).  The court denied a preliminary injunction on the sole ground that Petitioners had not shown irreparable harm.  Mem. Dec., at 3 n.1 (ECF No. 59).  The absence of irreparable harm does not equate to no relief.  Indeed, contrary to Verizon's representation, the court said that removal of the tower could "be required . . . at Verizon's expense, if the permit was issued improperly."  *Id.* at 10. Because the harm could be redressed, the court found it was not irreparable.

preponderance of the evidence standard.  The issue before the City was whether a tower in an

open space and within existing and preliminarily approved view corridors negatively impacted

that property.  It was Verizon's burden to come forward with evidence on that issue.  Having

failed to do so, the burden never shifted to Petitioners, and that element under Santa Clara City

Code § 17.40.060(B) was not established.

### D.     Specific Requirements for Telecommunication Facilities

Even when a wireless provider satisfies the conditions stated above, it must still satisfy an

ordinance specific to telecommunication facilities.    In an effort to balance the need for

telecommunication facilities on the one hand and preserve the City's visual resources on the

other, Santa Clara has established the following requirements:

> No telecommunication facility shall be installed . . . in or at a
> location . . . designated with a . . . park or *open space (OS) on the
> Santa Clara general plan*, unless it [1] blends with the surrounding
> existing natural and manmade environment in such a manner as to
> be effectively unnoticeable *and* [2] a finding is made that no other
> location is technically feasible.

Santa  Clara  City  Ordinance  §  17.42.190(B)  (emphasis  added).    Additionally,  Santa  Clara

Ordinance  17.42.210(A)  requires  an  explanation  for  "the  proposed  site  in  view  of  the  relative

merits of any of the feasible alternatives."

Frei Farm is located in an area designated as open space on the Santa Clara General Plan.

Consequently, Verizon bore the burden of proof to show by a preponderance of the evidence that

a tower at Frei Farm satisfied the above requirements.  Once the Planning Commission approved

Verizon's CUP application, the burden shifted to Petitioners to show that the City's decision was

arbitrary, capricious, or illegal.  The court concludes Petitioners satisfied their burden.

The court has detailed above the deficiencies in the evidence about the alternate locations.  Even though the City was advised by its expert to address deficiencies in the design parameters of the alternate sites, the City did not require Verizon to provide such information.  Without that information, one could not reasonably evaluate the relative merits of the alternative sites or decide if the alternative sites were technically infeasible.  The court therefore concludes the City's decision was arbitrary and capricious and reverses its decision.

## VI.   RELIEF

Petitioners request that the court enter a permanent injunction enjoining placement of a wireless tower at Frei Farm.  The Utah legislature, however, has set the remedy as follows: "If the court reverses a land use decision, the court *shall* remand the matter to the land use authority with instructions to issue a land use decision consistent with the court's ruling."  Utah Code Ann. § 10-9a-801 (emphasis added).  Accordingly, the court remands this action to the City and directs the City to void the conditional use permit issued to Verizon.  If Verizon elects to file a new application for a tower at Frei Farm, it must do so under the law existing at the time of the new application.  If Verizon is unable to meet the requirements for approval set forth in this decision, the City shall direct Verizon to remove the tower from Frei Farm.

### <u>CONCLUSION</u>

For the reasons stated above, the court GRANTS the Petitioner's motion (ECF No. 67) and DENIES Verizon and Santa Clara City's motions (ECF Nos. 68, 69).  Accordingly, the City's decision is REVERSED and the court REMANDS this case to the City to issue a decision consistent with this ruling.

DATED this 5th day of November, 2021.

BY THE COURT:

Clark Waddoups
United States District Judge